We move to the fourth case this morning, Jozef v. Berryhill. Quote Yogi Berra, déjà vu all over again. May it please the court, Dana Duncan on behalf of Christopher Jozefyk. And again, this is an issue of the articulation issue. In this particular case, we have simple routine repetitive tasks. No more than occasional contact with supervisors and coworkers. No public contact. Should not be in a situation in close proximity to the assigned work area. Mr. Duncan, are you challenging the RFC determination itself in this case? You said you weren't in your briefs, but then you seem to be challenging that determination. Yes and no. The RFC is what the determination is of what the claimant can or cannot do. And then that has to be conveyed through the hypothetical question. The problem comes in because the hypothetical question does not convey to the vocational expert all of the limitations. So the real problem is in the hypothetical question because the vocational testimony is what is the crux of the case. And where the determination is made at step five that he could or couldn't do other work in significant numbers in the national economy. So it's the hypothetical question and what was included or not included in that. Not the step before that, the RFC. Well, the RFC should reflect all the limitations as well. But for the purpose of what the flaw or problem is, it's the hypothetical question itself. In this particular case, we have, again, articulation issues. Now, occasional contact with supervisors and coworkers, for example. Maybe that was or wasn't supposed to accommodate his significant problems being around people. But the term occasional contact with supervisors and coworkers, that means up to one third of the day. Can we imagine a supervisor going up to an employee and going, excuse me, is this the third of the day that I'm allowed to talk to you? So again, we have the illusion this is supposedly reflecting the claimant's limitations. But without a proper level of articulation, we don't know. The idea that in the administrative realm, the commissioner interprets her own regulations and is given deference. The ALJ's interpretation of the regulations is given deference. The judge's decision is given deference. And yet we seem to have a problem with requiring the judges to articulate sufficient evidence and sufficient rationale for this court to just simply review it and see how they arrived at their conclusions. I don't understand exactly why ALJs have such a difficult time. They have assistants who help prepare the cases. They themselves try the cases. They have decision writers. They have a computer program that they fill out during the hearing, which puts all the boilerplate language into the decision already for them. So that by the time they walk out, they have a rough draft of their decision. All we need is for them to state why they're making these findings so that we can clearly indicate. It's like this is some sort of mystery. And I will say that the reason that it's somewhat of a mystery, at least the cynical nature of mine is, is because if they had to articulate clearly, we would find that mental illness is highly unrepresented in favorable decisions. And that's the problem I have. In this particular case, again, we have the state agency doctors who checked the boxes, and it made the indications of what the limitations are. They indicated that there were going to be moderate limitations in concentration, persistence, and pace, attention and concentration. There was a checkbox on being able to complete a normal work day and work week and maintaining a consistent work pace. And yet the hypothetical question doesn't reflect that. If any of these additional limitations were supposed to address it, and they may have, if the judge simply goes, well, and provides this, I've reviewed these medical opinions, or translates these and specifically indicates what rationale or support, that's the whole point of O'Connor-Spiner, is that there's a lack of any explanation of how these alternative limitations apply to concentration, persistence, or pace. If you are going to say that these do that, then explain it. And the failure to do so is the basis for this. In this particular case, and I would point out that the harm to Mr. Josephic in this particular case, is that he was unrepresented. He supposedly waived his right to counsel. The method used, as I articulated in my brief, was flawed. And just the fact that we're arguing about the sufficiency of the hypothetical question shows that there was harm that was caused by his failure to have counsel there to cross-examine the vocational expert and provide an alternative. Are you specifically denying that your client received the information from the agency, including the pamphlet? I don't know. Social Security sends materials out, and I will say from experience in representing over 1,000 claimants at one point in time, that they have sometimes difficulty reading. They have difficulty assigning it. But there's no specific denial in the record that he actually received that information? No. There's nothing that's specific. And he showed up at the hearing, which suggests he was receiving communications. Correct. Whether he read it or not, whether he understood it or not, are completely different issues. If he received it but didn't read it, whose burden is it then? Well, and that's again, he received notice in the hearing. Did he receive all of the other notices of his right to counsel that were included in the packet? But you said he may not have read it. And my response to that is, whose burden is it? If they sent it to him and he elected not to read it, then who does the burden fall on? It would be on him, Your Honor, and I admit that. But the problem again is that I have a paternal nature towards my clients, and so I want to make sure they understand what is going on in these cases, because a lot of them have very significant difficulty doing so. What else do you think the ALJ should have done with your client other than what she questioned him about at the beginning regarding his right to counsel? They have to be able to clearly indicate and explain to them what a contingency agreement is, what advice or assistance an attorney could provide in the hearing itself, make sure that they understand that lawyers can work sometimes by appointment for free from places like Judicare, which is a free service, and these have to be provided. And then I've seen judges go to the extreme of saying, these are the situations that may come up in this hearing, and do you feel comfortable representing yourself? Do you understand you're going to have to potentially ask questions of this vocational expert? Well, that might be a good practice to follow and something to recommend. Is there anything that requires going that far? The three steps of outlining the fact of what an attorney can do, that there's free services available, that the attorney who you hire can work on a contingency, those do have to be addressed. So you think the requirements that that information be in writing should extend to oral admonishments as well from the ALJ? The ALJ, that simple step should be, the ALJ should have an obligation to go through what was submitted in writing so that the claimant clearly can do it, because we have people with all levels of reading abilities and inabilities in these cases. I'll reserve the remainder of my time, so thank you. Thank you, Counselor. Good morning, Your Honors. My name is Catherine Siegel, and I represent the Commissioner of Social Security in this case. I'd like to address the representation issue first, since that's what we were speaking about most recently. There's no authority that says that the ALJ must present a waiver form at the hearing or get a signed waiver. There's no requirement that she discuss what has already been discussed in the pamphlets that were sent to the claimant. As long as the claimant is given an opportunity to state that he wants to waive his right to counsel at the hearing, that should be enough. Especially in this case, the claimant has a high school education. There's no indication that he was unable to read these pamphlets. They were sent to him on no fewer than five occasions, and as you pointed out, they were attached to the hearing notice that he received, and he attended the hearing. So one can safely assume that he did, in fact, receive the pamphlet that explains in detail the things that are important for a claimant to know about representation. The claimant should know that there's a benefit to having representation by an attorney at the hearing, and that's why that pamphlet was developed. And the claimant received it. There's no indication that he didn't know what the pamphlet said. In fact, when the administrative law judge questioned the claimant about right to representation, she asked, first of all, have you done anything to get a representative? Have you tried to get a representative? Why not have the ALJ review the three key points in the pamphlet? What would be the harm in requiring that? Well, the administrative law judge only has a certain amount of time for each hearing. And if she's certain that the claimant got the pamphlet and then asked what the claimant has done to get representation, and the claimant says, well, I tried to get an attorney, I went to several attorneys in the Green Bay area, which is what the claimant said here, and I also went to some attorneys who are closer to my home, and none of them wanted to take my case, then she can safely assume he knows that it's possible to get an attorney for a Social Security disability case. Why not have the ALJ confirm that the individual received the pamphlet? Well, that might be a best practice, but it's certainly not required, and none of the cases suggest that that is required. And so here there would not be a basis for remanding the case. We know the claimant tried to get an attorney, couldn't get one because they wouldn't take his case, not because he didn't know about the right to representation or not because he didn't think that there was a benefit to getting representation. The pamphlets explain to him that you can get it on a contingency basis. All the things that are required by the case law are contained in the pamphlet. The claimant received the pamphlet, and he elected at the hearing to continue. That's the other thing. If the ALJ asks the claimant, do you want to have more time so you can go and find an attorney? And he said no. He said, I can continue with the hearing right now, because he had not had a continuance yet, and so the ALJ was going to allow a continuance if that's what he wanted, and he said no, I can continue this hearing without an attorney. So we can be confident that the claimant knew what his rights were, that he knew the benefits of having an attorney, and that he waived that right. To suggest that he didn't get the pamphlet is specious. Now with regard to the main issue in the case regarding the accommodation of the claimant's mental impairments by the administrative law judge in his hypothetical question to the vocational expert, and really in the residual functional capacity finding, because the two here are identical. So it's not a question of what is presented to the vocational expert at the hearing. It's also what's in the decision, and the finding itself is supported by substantial evidence. And I would just like to remind the court that the plaintiff has the burden of proving with evidence what his restrictions are. And with regard to mental limits, he's the one who's presenting evidence of his condition. And the ALJ here looked at a variety of things when she was deciding what limits the claimant had with regard to her mental impairments. First of all, she considered Mr. Josephic's allegations, and the fact that he said that he had problems with memory, and problems with concentration, and trouble following verbal instructions, and anxiety when he was around other people. And she compared those allegations to what the record evidence said. And she looked at examination findings from Dr. Camp, who was an examining psychologist. She looked at the examination findings from Dr. Powers, who is a treating psychiatrist. And she looked at state agency psychologists who reviewed the record and formed narrative opinions about what the claimant could and couldn't do. And these are all important pieces of evidence that lead the court toward understanding where the ALJ got his restrictions from. Now specifically, Dr. Powers and Dr. Camp both did global assessments of functioning. And these are assessments that are done normally to determine what the treatment should be, and they give an idea of what the claimant's symptoms and functional limits are. In this particular instance, both of them gave scores that were in the moderate range of 55 to 60. What's the status of GAF scores in security practice these days? Currently, the Diagnostic Statistical Manual, which is where the Global Assessment of Functioning assessment is or was, they've eliminated it from the DSM-5. So it's no longer in there, and generally you don't see them anymore in psychological opinions. So when you're seeing a psychologist do an assessment of a claimant in an examination, they don't have that AXIS-5 anymore, or they talk about GAF scores because it's been eliminated. So why did they come up here? Well, they came up here because this is a case that was originally filed in 2011, and the decision was 2015. At that point, the GAF scores were still included in the psychologist's opinions, and so they're something that the ALJ considered. And here they indicated moderate limitations. And I just would like to remind the court also that a moderate limitation is not a complete limitation. So when one finds that there's a moderate restriction, there's a capacity in that area. It's not a complete restriction, and it's a wide range. That's another reason why we wouldn't include the language moderate, concentration, persistence, or pace limits to a vocational expert, because that really does encompass a very broad range of possibilities. So when you're asking a vocational expert a question, you want to narrow those limits down into something that is vocationally relevant. And a vocational expert is not going to be making medical judgments about the claimant. He is going to be looking at specific restrictions that are assessed by the ALJ after looking at the record, and those limits are then applied to the vocational expert's knowledge of jobs in that region and in the country. Based on a document that the Labor Department provides? Not necessarily. The vocational experts really draw a lot also on their expertise. They are rehabilitation counselors. I've, in case earlier, heard that some of those documents are long out of date. Well, for example, the Dictionary of Occupational Titles is an old document. It has not been updated for quite a while. But that is for more job category descriptions. And I think the reason that they still adhere to identifying them in the context of the Dictionary of Occupational Titles is because we have a Social Security ruling that requires that that be addressed, that their testimony is consistent with the Dictionary of Occupational Titles. But when a vocational expert is testifying, he or she is looking at the claimant from her eyes or his eyes of what the jobs are in the community. So these vocational rehabilitation counselors, who are the vocational experts in these cases, they actually do place people in jobs, and they have a knowledge of the workforce, and they know what kind of restrictions would be accommodated by certain jobs. So in this particular instance... Well, there are documents then that have that sort of information, apart from the one that you described so out of date? Well, when they testify, they have statistical documentation that they use from the Bureau of Labor Statistics, things like that. A lot of times, if they're questioned about it at the hearing, they'll talk about what specific government publications they rely on, and they'll also say that generally they rely on some of their own expertise in the area of placing an individual in a specific job. So here we have jobs like floor waxer that the vocational expert had identified as a possible job that this claimant could do, even though he couldn't be around in close proximity to a supervisor or a co-worker. Now, some of these jobs no longer exist, and there are many other jobs, like floor waxer, kitchen helper, machine operator. I believe those jobs all exist here. Yeah, no, I'm just saying they don't. Yeah, that's not an issue, and no one has questioned that those jobs would accommodate the claimant's stated restrictions. And it's not appropriate for the vocational expert to make a medical judgment on his own, to look at the medical records on his own and identify restrictions that were not identified by the specific hypothetical question from the vocational expert. I thought we were being told vocational experts aren't allowed to do that. No. Under agency policy, vocational experts are not allowed to review the medical records on their own. They're not allowed to make independent reviews of the record and come to medical conclusions. That's outside the area of their expertise. And to the extent that the court has suggested that might be a way of filling the gap where they're not sure where the limits came from, it's really not appropriate. I thought you were saying a moment ago that vocational experts do that. No, vocational experts take a restriction that's given to them by the administrative law judge, and then they take that information and say this job would be accommodated by those restrictions. They're not making an independent medical judgment on what the claimant's limits are. That's something that is established by the medical records, by the medical opinions. And here we had two psychologists who reviewed the record and came up with restrictions. One of the things I wanted to point out, the claimant's attorney seems to have misspoke about some of the restrictions that were in that Section 1 part of the mental residual functional capacity assessments that's done by the state agency psychologist. He was calling it the checkbox form. In this particular case, they're no longer using the checkbox form, but it's essentially the same idea where they have a first section where they're going through specific stated restrictions  or moderately limited or markedly limited. Here, the state agency psychologist found moderate limits in only three of the areas, only three of the stated areas, and that they did not have a significant limitation on pace. On being able to do a normal workday and workday without interruptions and perform at a consistent pace, the doctors both found that the claimant was not significantly limited in that area. That is a good reason why that limit would not show up in the narrative discussion of the state agency psychologist's opinion. I would conclude that substantial evidence supports the ALJ's decision, and I would ask the court to affirm the commissioner's decision. Counsel, I'll give you an additional two minutes again. All right. Thank you. As far as the issue that was just broached about vocational experts and the medical evidence, vocational experts are at hearings and listen to the medical evidence from medical experts called and will oftentimes use the testimony from a medical expert at hearing and make points in their findings on the hypothetical question. But they can't independently look at the medical records. You agree with that? That is accurate, but they do do that. I would point out, just to highlight the issue of articulation, the state agency doctor, Dr. Muschel, page 117 of the record, in a situation where he had to be placed around others, he may have moderate difficulty maintaining attention, concentration, persistence, and pace, A-C-P-E. Now, if you look at the transcript of the hypothetical question, the first hypothetical question does not include any limitation to proximity to others. The judge then asks, or they give jobs, cashier, checker, security guard. Then they add the no supervisor or worker should be situated in close proximity to the assigned work area, and by that within 10 to 15 feet. Then the security guard and cashier checker are eliminated. This is page 94 of the transcript, the testimony of the vocational expert. He then goes on to indicate that there could be jobs as a janitor and a cleaner. There are 1.3 million of those jobs. That's for the SOC, the Selective Occupational Characteristics Code that the Department of Labor puts out. That's raw number. In that raw number. Page and wide, so we don't know what it is. Well, there may be, in a particular case, as many as 1,592 different DOT codes that fall under that, ranging from sedentary to very heavy. So we don't know how many of those jobs pertain. The vocational expert then points out, well, I'd have to significantly limit the number because of the requirement about the restriction on contact with others and especially the public. So I've cut that in about half to about 0.3 million. Excuse me, it wasn't half. He cut to about 0.3 million. Well, where did the 10 to 15 feet come in? It's not in any medical record. It's not in any finding by a doctor. And obviously, if you take that out, does that now mean that if he's around anybody, he's working in isolation? If he's working in isolation, are there jobs? And if there are jobs, do they exist in significant numbers? So, yes, these are case-by-case situations. They're highly technical. And there are no blanket rules on this. You have to look at the total. That's why the articulation problem is so important. Social security law is like the duck-billed platypus of law. It's not as much about law as it is about art. Knowing when you have enough evidence and knowing what one piece of evidence will do when another piece of evidence exists and what the final outcome will be. Thank you, counsel. All right, thank you. Thanks to both counsel, and the case is taken under advisement.